UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

STONEWELL CORP., and RICHARD GLADSTONE,

                Plaintiffs,

      -against-                  04 CV 9867 (KMW)(GWG)
                                        OPINION AND ORDER

CONESTOGA TITLE INSURANCE CO.,
WILLIAM KOLSHORN, and JERSEYSEARCH
TITLE SERVICES, INC.,

                Defendants.
-----------------------------------X
     - as consolidated with -
-----------------------------------X
CONESTOGA TITLE INSURANCE CO.,
WILLIAM KOLSHORN, and JERSEYSEARCH
TITLE SERVICES, INC.,

                Plaintiffs,

      -against-

STONEWELL CORP., RICHARD GLADSTONE,

                Defendants.

-----------------------------------X

KIMBA M. WOOD, U.S.D.J.:

     In the above-captioned case, the central issues before the
Court are (1)  whether JerseySearch Title Services, Inc. and
William Kolshorn (collectively, "Title Defendants") are liable
for failing to disclose a lis pendens on the Center Point Mall;
and (2) whether Stonewell Corporation and Richard Gladstone

(collectively, "Stonewell")[1] are entitled to coverage under a title insurance policy issued by Conestoga Title Insurance Company ("Conestoga") for a mortgage on a New Jersey property known as Center Point Mall.

For the reasons discussed below, the Court holds that Stonewell is collaterally estopped from asserting that Stonewell (1) ever owned the mortgage on Center Point Mall (hereinafter, "the Center Point Mortgage"); and (2) was unaware of the fact that it never owned the Center Point Mortgage.  Based on these holdings, the Court concludes that Title Defendants are not liable for failing to disclose the lis pendes on the Center Point Mall.

The Court also holds that there are genuine issues of material fact as to whether Conestoga has waived its right to deny coverage under the title insurance policy on the Center Point Mortgage (hereinafter, "Mortgage Policy").

Accordingly, the Court: (1) GRANTS Title Defendants' motion to dismiss all of Stonewell's claims against Title Defendants;[2] and (2) DENIES both Conestoga's motion for summary judgment and Stonewell's motion for partial summary judgment against

---

[1] Because the parties do not dispute that Gladstone is the sole shareholder in Stonewell, this opinion will refer to them, collectively, as "Stonewell."

[2] For this same reason, the Court DENIES in its entirety Stonewell's motion for summary judgment against Title Defendants.

Conestega.

## I.  Background

In this background section, the Court addresses the facts pertinent to resolving the parties' summary judgment motions. The Court begins by describing the proceedings in the Middle District of Florida and the Eleventh Circuit.  These proceedings are relevant because: (1) they prompted Stonewell to seek coverage under the Mortgage Policy; and (2) they establish the facts that Stonewell is collaterally estopped from relitigating in this action.  The Court then turns to the procedural history of the present actions.

### A. Facts

Stonewell Corporation, a corporation whose sole shareholder, officer, and director is Richard J. Gladstone, alleges that in March 1997, it sought to purchase the Center Point Mortgage. Stonewell contacted Conestoga, a business engaged in providing title insurance to real estate buyers, for the purpose of securing title insurance.

Conestoga arranged for Title Defendants to conduct a title search of the Center Point Mall in order to assess whether the property had defects, liens, or encumbrances on the title. During this title search, Title Defendants discovered, but did not disclose, to anyone, not even Conestoga, a title impediment in the form of a <u>lis pendens</u> (notice that the property is the

3

subject a pending lawsuit).

Stonewell alleges that it bought the Center Point Title after Title Defendants informed it that the title had no defects, liens, or encumbrances.[3]  On March 24, 1997, Conestoga also relied on this information when it issued the Mortgage Policy to Conestoga, and listed no exceptions from coverage.

### 1.  Policy Description

In the Mortgage Policy, Conestoga agreed to insure Stonewell in the amount of $4,000,000, in the event of loss or damage arising from certain defects in Stonewell's claim of title to the Center Point Mortgage.  The Mortgage Policy also stated that upon written request of Stonewall, Conestoga would pay for Stonewell's defense against third-parties making claims adverse to Stonewell's title based on a title defect, lien, or encumbrance. The Policy included an attachment that set forth certain exclusions from coverage.[4]

---

[3] For the reasons discussed below, Stonewell is collaterally estopped from arguing that it purchased the Center Point Mall on its own behalf.

[4] The Policy stated:
The following matters are expressly excluded from coverage of this policy and [Conestoga] will not pay loss or damage costs, attorneys' fees, or expenses which arise by reason of . . . . [d]efects, liens, encumbrances, adverse claims, or other matters:
 (a) created, suffered, assumed or agreed to by the insured claimant;
 (b) not known to [Conestoga], not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to [Conestoga] by the insured claimant prior [to] the date the insured claimant became an insured under this

2.  Factual Description of Related Litigation

Soon after purchasing the Mortgage Policy, Stonewell became involved in several lawsuits related to the validity of its title to the Center Point Mortgage.

a.  Williams Action

On November 17, 1997, Stonewell sent a claim letter to Conestoga requesting that Conestoga provide it with counsel to represent Stonewell's interests in an action brought by Donna Williams ("Williams"), the Insurance Commissioner for the State of Delaware, against the officers of the Heritage Life Insurance Company ("Heritage Life").  See Donna Lee H. Williams, Insurance Commissioner for the State of Delaware v. LPDA Acquistition Corp., et al., 96 Civ. 3079 (BDP)(the "Williams Action").

Williams claimed that officers of Heritage Life had stolen money from Heritage Life and used some of it to buy the Center Point Mall in New Jersey.  She sought to obtain title to the Center Point Mall property, so that she could then sell the property and give the proceeds from the sale to the defrauded Heritage Life.

Stonewell became involved in the action in order to assert its alleged interest in the Center Point Mortgage, and to ensure that the Williams Action did not extinguish Stonewell's alleged

policy; [or]
 (c) resulting in no loss or damage to the insured claimant.

interest.   Conestoga agreed to provide Stonewell with counsel, and made the following reservation of rights: (1) the offer to defend Stonewell was not an admission of liability or a waiver of coverage defense under the Policy; (2) Conestoga reserved the right to terminate the tender of the defense; and (3) Conestoga could require reimbursement of the attorneys' fees expended on Stonewell's behalf if Conestoga later determined that Stonewell was not entitled to coverage under the Mortgage Policy.

Stonewell accepted the counsel Conestoga provided – Matthew Dollinger.   Conestoga paid Stonewell's substantial attorney's fees and expenses in the Williams Action until 2000, when the presiding judge stayed the action.

### b.   Weiss Action

In April 1998, some of the Heritage Life officers were indicted in the Middle District of Florida for looting and defrauding Heritage Life.   After a jury trial, Shalom Weiss, a former Heritage Life officer, was convicted of violating the Racketeer Influenced and Corrupt Organization Act ("RICO"). United States v. Weiss, 98-cr-99-Orl-19 (KRS)("Weiss Action"). The jury returned a special verdict of forfeiture against Weiss, finding that Weiss's alleged interest in a number of assets, including Stonewell, should be forfeited to the United States. In February 2000, the district court in the Weiss action entered a preliminary order of forfeiture, requiring Stonewell to forfeit

6

its interest in the Center Point Mortgage to the United States.

c. <u>First Forfeiture Petition</u>

On April 5, 2000, Stonewell filed a petition pursuant to 18 U.S.C § 1963(1) (hereinafter, the "First Forfeiture Petition") to protect Stonewell's interest in the Center Point Mortgage from the District Court's forfeiture order.  The First Forfeiture Petition stated that Gladstone was the exclusive owner of Stonewell and its assets, such as the Center Point Mortgage, and, therefore, the Center Point Mortgage could not be forfeited to the United States as one of Weiss's properties.  The Government argued that Stonewell was simply a nominee for Weiss, which was holding the Center Point Mortgage for Weiss, but had no ownership interest in the property.

In August and November 2001, the Honorable Karla R. Spaulding, Magistrate Judge for the Middle District of Florida, held a seven-day evidentiary proceeding on the merits of the First Forfeiture Petition.  She allowed Stonewell's counsel, Dollinger, to make an opening statement, put on direct testimony, cross-examine the United States's witnesses, object to the admissibility of documentary exhibits offered by the Government, and make a closing statement.[5]  Gladstone himself testified in

_____

[5] Gladstone retained Dollinger as counsel in the proceedings relating to the First Forfeiture Petition.  Gladstone, and not Conestoga, paid Dollinger's fees.

support of Stonewell's claim.[6]

On October 29, 2002, the Honorable Patricia C. Fawcett, District Court Judge for the Middle District of Florida, issued an opinion and order (hereinafter, "October 2002 Order") based in part upon the evidence presented in the <u>Weiss</u> trial and the evidentiary proceedings before Judge Spaulding.

Judge Fawcett's October 2002 Order found that Gladstone was the sole owner of Stonewell. She also found that Stonewell was helping Weiss to launder money. Stonewell did so by advancing money to third-parties for the Center Point Mortgage; Stonewell did not expect to actually acquire title to the mortgage — instead, Stonewell expected that its funds "would be protected and repaid surreptitiously by Sholam Weiss." Judge Fawcett concluded that Stonewell allowed its name to be used on the title even though it had no claim to the property; she concluded that Stonewell was acting as a nominee for Weiss and had no ownership interest in the Center Point Mortgage.

d.  <u>Eleventh Circuit Appeal in 2004</u>

Gladstone appealed the October 2002 Order to the United States Court of Appeals for the Eleventh Circuit (hereinafter the

---

[6] In a Report and Recommendation (the "Report"), Judge Spaulding concluded that Stonewell had no interest in the Center Point Mortgage, or the Center Point Mall more generally, because Stonewell's interest in the Center Point Mortgage was only that of a nominee for Sholam Weiss. That conclusion was adopted by the district court.

"Eleventh Circuit").  On April 15, 2004, the Eleventh Circuit affirmed in part and reversed in part the October 2002 Order. The Eleventh Circuit affirmed the district court's conclusion that Stonewell never owned the Center Point Mortgage, because Stonewell was acting as Weiss's nominee.  At the same time, the Eleventh Circuit reversed and vacated the portion of district court's order that forfeited the Center Point Mortgage to the Government, holding that the district court did not have the jurisdiction to award the Center Point Mortgage to the United States because the jury forfeiture verdict applied only to Weiss's alleged interest in Stonewell, not to Weiss's interest in the Center Point Mortgage.

> e.  Remand

On remand, Judge Fawcett granted the United States's amended preliminary order of forfeiture (hereinafter, the "Amended Forfeiture Order"), which cured the jurisdictional defect identified by the Eleventh Circuit.

Stonewell wrote to Conestoga requesting that Conestoga fund its second petition pursuant to 18 U.S.C. § 1963, in which it sought to challenge the Amended Forfeiture Order (hereinafter, the "Amended Forfeiture Petition").  Conestoga agreed to pay for counsel, subject to reservations that was similar to the reservation of rights letter provided in the Williams action.

In May 2005, Judge Fawcett issued an order dismissing the

Amended Forfeiture Petition (hereinafter, "May 2005 Order").  The
May 2005 Order found that Stonewell was collaterally estopped
from relitigating issues already determined in the October 2002
Order.  The May 2005 Order also granted the Government's motion
for summary judgment on the ground that the Center Point Mall was
"free and clear" of any claim by Stonewell.

Stonewell appealed the May 2005 Order to the Eleventh
Circuit.  On October 18, 2006, the Eleventh Circuit dismissed
Stonewell's appeal for lack of standing.  Gladstone petitioned
the Eleventh Circuit for a rehearing en banc and petitioned the
Supreme Court for a writ of certiorari.  Both petitions were
denied.

**C. Procedural History**

Stonewell here seeks to hold Title Defendants liable for
failing to disclose the lis pendes on the Center Point Mortgage,
and to require Conestoga to provide coverage under the terms of
the Mortgage Policy.

The first complaint in the instant consolidated case was
filed in 2004 by Stonewell against Title Defendants.  Stonewell
alleges that Title Defendants knowingly failed to disclose the
lis pendens against the Center Point Mall.[7]  Stonewell claims

---

[7] The first complaint was superceded by an Amended
Complaint.  The Amended Complaint, filed on December 24, 2004,
brings the following three claims against Title Defendants: (1)
fraud; (2) violation of New Jersey Unfair Trade Practices Act;

that had it known about this defect, it would not have agreed to purchase the Center Point Mortgage.  Stonewell seeks to recover for Title Defendants' alleged negligence and fraud.

In the second complaint, Conestoga seeks a declaratory judgment that the Mortgage Policy is void, and damages to compensate Conestoga for Stonewell's allegedly fraudulent representation regarding its ownership interest in the Center Point Mall.[8]

In the third complaint, Stonewell seeks to recover from Conestoga under the Mortgage Policy for Stonewell's loss resulting from the Center Point Mortgage's defective title.[9]

---

and (3) negligence.

[8] Initially, Conestoga's complaint was filed in the Middle District of Florida.  In 2005, it was transferred to the Southern District of New York.  Conestoga makes the following five claims: (1) Stonewell committed fraud in the inducement; (2) Conestoga is entitled to declaratory judgment that the policy is void ab initio on account of Stonewell's fraud; (3) Stonewell violated the New Jersey Insurance Fraud Prevention Act; (4) Conestoga is entitled to a declaratory judgment that the policy is void ab initio because Stonewell does not own any property covered by the Policy; and (5) Conestoga is entitled to a declaratory judgment that there is no coverage under the policy for the Second Forfeiture Proceeding and the Williams Action.

[9] On December 15, 2004, Stonewell filed a complaint against Conestoga seeking: (1) a declaratory judgment that Conestoga is required to indemnify Stonewell for up to $4,000,000; (2) a declaratory judgment that neither Stonewell nor Richard Gladstone engaged in fraud when it purchased the Mortgage Policy from Conestoga; (3) a declaratory judgment that Stonewell is entitled to the full proceeds of the sale of the Center Point Mortgage and that Conestoga should pay damages arising from its breach of the terms of the Mortgage Policy; (4) a declaratory judgment that breached the Mortgage Policy; (5) a declaratory judgment that

All of these actions were stayed from 2005 to 2007, pending resolution of the Florida proceedings described above.  In March 2008, after the Florida proceedings concluded, Conestoga and Title Defendants filed motions for summary judgment.  Stonewell filed a cross-motion for partial summary judgment.[10]

Before addressing the specifics of each of these motions, the Court considers whether the Florida proceedings collaterally estop Stonewell from any factual assertions.  The Court holds that the Florida proceedings collaterally estop Stonewell from arguing that: (1)  Stonewell owned the Center Point Mortgage; and (2) Stonewell did not know that it was acting as a nominee for Weiss.

Based on the collateral estoppel determination, the Court holds as a matter of law that Stonewell does not have standing to bring a claim against Title Defendants, because Stonewell cannot establish that it was injured as a result of Title Defendants' conduct.  Accordingly, the Court GRANTS Title Defendants' motion

---

Conestoga and Title Defendants engaged in fraud; (6) a declaratory judgment that Conestoga and Title Defendants violated the New Jersey Unfair Trade Practices Act; and (7) a declaratory judgment that Stonewell is entitled to damages arising from Conestoga's and Title Defendants' negligence.

[10] This consolidated case was initially before the Honorable Charles L. Brieant.  Judge Brieant held a conference on May 23, 2008 regarding the motions for summary judgment.  Soon thereafter, the case was reassigned to the Honorable Cathy Siebel, and then later reassigned to the Honorable Stephen C. Robinson.  On July 13, 2009, the case was reassigned to the undersigned.

to dismiss Stonewell's claims against Title Defendants in their entirety.

The Court also concludes, based on the collateral estoppel determination, that Conestoga has established as a matter of law that Stonewell is subject to the Mortgage Policy's exclusions from coverage provision.  However, there is a genuine issue of material fact as to whether Conestoga waived its right to deny Stonewell coverage under the Mortgage Policy.  Accordingly, the Court DENIES both Conestoga's motion for summary judgment on its claims against Stonewell and Stonewell's motion for partial summary judgment on its claims against Conestoga.

## II.  Legal Standard for Summary Judgment

Summary judgment is warranted if the pleadings, affidavits, and disclosures that form the record establish that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007).

In deciding a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor.  In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008).  Summary judgment should be denied "if the evidence is such that a reasonable jury could

return a verdict" in favor of the non-moving party. <u>NetJets Aviation, Inc. v. LHC Commc'ns, LLC</u>, 537 F.3d 168, 178-79 (2d Cir. 2008).  However, the non-moving party cannot "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  <u>W. World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotations omitted).

## III. Collateral Estoppel

For the following reasons, Stonewell is collaterally estoped from arguing that it ever owned the Central Point Mortgage, and that it was unaware that it was acting as nominee for Weiss.

### A.  Legal Standard

The doctrine of collateral estoppel allows a party to "foreclose the [opposing party] from litigating an issue the [opposing party] has previously litigated unsuccessfully in an action with another party."  <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326 n.4 (1979).[11]

---

[11] There are two uses of collateral estoppel, offensive collateral estoppel and defensive collateral estoppel:

> [O]ffensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party. Defensive use occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has

A party seeking to invoke collateral estoppel must establish that each part of the following four-part test is met: (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits. Indus. Risk Insurers v. Port Auth., 493 F.3d 283, 287 (2d Cir. 2007) (citing Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)).[12]

### B. Application

Here, the Court must assess whether Stonewell is collaterally estopped for arguing issues that were already

---

previously litigated and lost against another defendant. Parklane Hosiery, 439 U.S. at 326 n.4.

With respect to the claims involving Conestoga, offensive and defensive collateral estoppel are functionally the same because each party is asserting a host of claims and counterclaims and, therefore, each acts as both plaintiff and defendant.

Title Defendants, however, are invoking only defensive collateral estoppel because they are not bringing any counterclaims against Stonewell.

[12] Even if a party establishes these four elements, a court has the discretion to decide whether to apply the doctrine of collateral estoppel. Parklane Hosiery, 439 U.S. at 331 (declining to preclude the use of collateral estoppel and instead granting trial courts "broad discretion" to determine when it should be applied). In exercising this discretion, a court typically considers judicial economy and the fairness of relying on collateral estoppel to either assert or preclude certain claims. Id. at 329-31.

resolved by the Middle District of Florida and the Eleventh
Circuit.  For the following reasons, the Court finds that the
four-part test for collateral estoppel has been met.  Thus,
Stonewell is collaterally estopped from arguing that it owned the
Center Point Mortgage and that it did not know it was acting as
Weiss's nominee.

    1.  Identical Issues were Raised in Previous Proceeding

The issues resolved in the October 2002 Order are identical
to the issues here.  The October 2002 Order found that:

> The Center [Point] Mortgage was not an asset owned by
> Stonewell.  Gladstone, using [Stonewell] corporation,
> acted as Weiss' nominee to hide Weiss' interest in the
> mortgage.  The asset, the mortgage, was never owned by
> Stonewell in its own right.

Stonewell argues that the issues considered by Judge Fawcett
were narrower than the issues here and, therefore, the issues are
not identical.  According to Stonewell, in the October 2002
Order, Judge Fawcett was deciding the narrower issue of whether
Stonewell had a legal interest that was superior to that of the
United States, and not the broader issues of whether Stonewell
had any ownership interest in the Center Point Mortgage and
whether Stonewell was acting as Weiss's nominee.  The Court
rejects this argument.

The issues before Judge Fawcett were whether Stonewell ever
owned the Center Point Mortgage and whether Stonewell was simply

16

acting as a nominee for Weiss.[13]   These are the same issues that
are before this Court.[14]

   2.   Issues Actually Litigated and Decided in Previous
Proceeding

   The issues of whether Stonewell had an ownership interest in
the Center Point Mortgage and whether Stonewell was knowingly
acting as a nominee were actually litigated and decided in the
Florida proceedings.

   The Eleventh Circuit held that these issues of Stonewell's
ownership interest were already litigated before Judge Fawcett:
"[T]he record [] demonstrates that the issue[s] [were] actually
litigated in [Judge Fawcett's Order denying Stonewell's
Petition], as evidenced by the lengthy testimony of Mr. Gladstone
and the others at the evidentiary hearing held before Magistrate
Judge Spaulding."   The Court agrees with the Eleventh Circuit's
holding.

   The issues were also decided by Judge Fawcett.   The

_____

   [13] In the 2006 Opinion, the Eleventh Circuit stated: "The
issue[s] before the District Court in the Gladstone Petition [the
October 2002 Order], . . . for collateral estoppel purposes . . .
[were] the ownership of the Center Mall Mortgage," and by
extension Weiss's status as a nominee.

   [14] In the October 2002 Order, the resolution of these issues
led Judge Fawcett to conclude that the property was subject to
forfeiture, whereas, here, the resolution of these issues is part
of the Court's determination of whether Stonewell is entitled to
recover under the Mortgage Policy.   But, the core issues in both
of these cases are identical.

Eleventh Circuit correctly explained: "In adjudicating Gladstone['s] [Forfeiture] Petition, the [Florida] District Court necessarily decided the ownership issue because it had to determine which assets, if any, Stonewell owned in order to decide whether Mr. Weiss had an interest in Stonewell."  It decided that Stonewell had no ownership interest in the Center Point Mortgage because it was acting as Weiss's nominee.

Despite the Eleventh Circuit's clear and compelling holdings on this point, which this Court adopts, Stonewell argues that these issues were not decided by Judge Fawcett's October 2002 Order.  Stonewell relies on the following language, in a footnote in the October 2002 Order: "The entire title insurance policy does not appear to be in the record.  There is no evidence of record that Gladstone or Stonewell made a claim on this 'policy.' Nothing in this case prevents such a claim from being made."

Stonewell argues that the Court should read this footnote as stating that the October 2002 Order did not have any impact on Stonewell's claim to the Mortgage Policy.  In re PCH Assoc., 949 F.2d 585, 593 (2d Cir. 1991)(explaining that when a court expressly states that it is not deciding an issue, no preclusive effect is given to that issue in subsequent proceedings).  The Court rejects Stonewell's interpretation of the footnote.

The question of whether Stonewell can recover under the Mortgage Policy was not before the Middle District of Florida.

18

Therefore, the October 2002 Order's discussion of the Mortgage Policy is dicta that is not binding on this Court.

Accordingly, the Court finds that the issues of whether Stonewell had an ownership interest in the Center Point Mortgage and whether Stonewell was acting as a nominee for Weiss, were litigated and decided in the Florida action.

3.  <u>Stonewell Had Full and Fair Opportunity to Litigate the Issues</u>

Stonewell was afforded a full and fair opportunity to litigate the issues of its ownership interest in the Center Point Mortgage.  The October 2002 Order was based on a proceeding in which Stonewell exercised "control of the presentation on behalf of a party" and "[had] the opportunity to present proof and arguments on the issues litigated." <u>United States v. Davis</u>, 906 F.2d 829, 833 (2d Cir. 1990).

In the October 2002 Order, Judge Fawcett stated that she relied on the seven-day evidentiary hearing before Magistrate Judge Spaulding.  In this proceeding Stonewell: (1) was represented by counsel of its choosing, Matthew Dollinger; (2) made opening and closing statements; (3) put on direct testimony; (4) cross-examined government witnesses; and (5) objected to the admissibility of exhibits.  This proceeding afforded Stonewell an ample opportunity to control the litigation and to present proof and arguments in favor of its ownership interest in the Center

Point Mall.

Stonewell contends that the October 2002 Order's reliance on evidence and testimony provided at the Weiss trial,[15] violates Stonewell's due process rights.  Stonewell argues that because it was not afforded the opportunity to control any of the Weiss litigation or present evidence in the criminal trial, it was not afforded a full and fair opportunity to litigate the issues.  The Court disagrees.

In the evidentiary hearing before Magistrate Judge Spaulding, Stonewell had the opportunity to challenge the evidence presented in the Weiss trial, to the extent that this evidence pertained to Stonewell's claims, and to establish its ownership interest in the Center Point Mortgage by presenting it own arguments and evidence.  See United States DOJ v. Hudson, 2007 U.S. Dist. LEXIS 62749, at *10 (N.D.N.Y 2007) ("The Second Circuit has adopted a broad definition of what qualifies as a full and fair opportunity to litigate an issue."); Chauffeur's Training Sch., Inc. v. Spellings, 478 F.3d 117, 132 (2d Cir. 2007)(finding that a party had a full and fair opportunity to litigate an issue before an administrative law judge even though

---

[15] Courts considering 18 U.S.C. § 1963 petitions shall: (1) conduct a hearing at which testimony and evidence is presented; and (2) "consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture." 21 U.S.C. § 853.  The parties do not dispute that Judge Fawcett complied with these requirements.

the party did not have access to discovery and could not cross-examine witnesses in the administrative proceeding).

Accordingly, the Court finds that Stonewell was afforded a full and fair opportunity to litigate the issues of its ownership interest in the Center Point Mortgage and its status as a nominee.[16]

### 4.   Resolution of the Issue was Necessary to Support a Valid and Final Judgment

As noted above, the October 2002 Order resolved the factual issues of whether Stonewell owned the Center Point Mortgage, or whether Stonewell was simply acting as Weiss's nominee.  The resolution of these issues was necessary to a valid and final judgment, because the resolution of these issues formed a basis for the Court's decision that the United States was entitled to the Center Point Mortgage.

Stonewell argues before this Court, as it did before the Eleventh Circuit, that the October 2002 Order's statements

---

[16] In reaching the conclusion, the Court also rejects Stonewell's argument that a finding of collateral estoppel would deprive Stonewell of its Seventh Amendment right to a trial by jury.  A party is entitled to an trial by jury in a civil matter only if there is a fact-finding role for the jury.  Parklane Hosiery, 439 U.S. 322, 335 (1979); Falbaum v. Pomerantz, 19 Fed. Appx. 10, 12 (2d Cir. 2001)(stating that the "Seventh Amendment [does] not prevent the application of collateral estoppel to a second action even though the first action was determined by a judge and the parties were not the same in both actions").  Here, since Judge Fawcett has already engaged in the pertinent factfinding, Stonewell is not entitled to a trial by jury on these issues.

regarding the ownership status of Center Point Mortgage and Stonewell's role as Weiss's nominee were merely dicta.

This Court, like the Eleventh Circuit, finds this argument to be unpersuasive.  The October 2002 Order's conclusion that Stonewell did not have a property interest in the Center Point Mortgage and instead was acting as Weiss's nominee, was integral to its decision to deny Stonewell's Petition.  Without these conclusions, Judge Fawcett could not have found that the United States's interest in Center Point Mortgage was superior to Stonewell's interest.  This Court finds that the resolution of these issues was necessary to a valid and final judgment.

### 5.   Conclusion

The Court finds that all the elements of collateral estoppel have been established, and that Stonewell is collaterally estopped from arguing that Stonewell owned the Center Point Mortgage or that it was unaware that it was merely a nominee of Weiss.  The Court finds that Stonewell has had ample opportunities to litigate these factual matters before the Middle District of Florida and the Eleventh Circuit, and that these finding are just.[17]

## IV.  Title Defendants' Motion for Summary Judgment

Based on the Court's finding of collateral estoppel, the

---

[17] Stonewell requests that the Court use its discretion not to apply collateral estoppel.  The Court rejects this request because it finds no compelling reason to do so.

Court finds that Stonewell does not have standing to bring any claim for fraud or negligence against Title Defendants. Accordingly, the Court grants Title Defendants' motion for summary judgment in its entirety.[18]

### A. Legal Standard

Under Article III, judicial power extends only to "cases and controversies." See U.S. Const. art. III, §2, cl. 1. Therefore, a plaintiff must establish that its claim is a case or controversy in order for a Plaintiff to have Article III standing. To do so a plaintiff must show: (1) an injury in fact, (2) a causal connection between the alleged injury and the challenged act, and (3) that the injury likely would be redressed by a favorable decision. Kalsson v. U.S. Fed. Election Comm'n, 356 F. Supp. 2d 371, 373 (S.D.N.Y. 2005) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)); see also Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 329 (1999).

### B. Application

The Court finds as a matter of law that the Title Defendants' action did not cause Stonewell's alleged injury. Thus, Stonewell has no standing to bring its fraud and negligence

---

[18] For the same reasons that the Court grants Title Defendants' motion for summary judgment, the Court DENIES Stonewell's motion for partial summary judgment against Title Defendants.

claims against Title Defendants.

Here, the alleged injury was Stonewell's purchase of the Center Point Mortgage with a blemished title. Stonewell contends that had it known that there was a <u>lis pendes</u> on the property, it would not have purchased the Center Point Mortgage. Stonewell cites Title Defendants' failure to disclose this information as the cause of Stonewell's injury.

The Court rejects Stonewell's argument. The Court found in its collateral estoppel analysis that Stonewell knowingly acted as Weiss's nominee and, thus, never acquired title to the Center Point Mortgage. Therefore, Stonewell's assertion that it relied on Title Defendants' representations when it purchased the Center Point Mortgage necessarily fails.

Accordingly, the Court GRANTS Title Defendants' motion for summary judgment on all of the claims asserted against them by Stonewell.

## V. Motions for Summary Judgment involving Conestoga

The crux of the dispute between Conestoga and Stonewell relates to whether Stonewell is entitled to coverage under the Mortgage Policy. Conestoga argues that Stonewell is unable to establish that it suffered a loss under the terms of the Mortgage Policy, and, therefore, that Conestoga is entitled to recover all of the legal fees it paid on Stonewell's behalf and to deny any future coverage. Conestoga also argues that Stonewell's

24

misrepresentation regarding its ownership interest in the Center Point Mall entitles Conestoga to declaratory relief and damages. Stonewell contends that Conestoga is not entitled to any of the requested relief because it has waived its right to deny coverage under the Mortgage Policy.

The Court finds that Conestoga did not properly inform Stonewell that it had a right to reject Conestoga's offer of a defense. For the following reasons, the Court finds there are genuine issues of material fact as to whether Conestoga has waived the right to deny Stonewell coverage. Accordingly, the Court DENIES both Conestoga's and Stonewell's motions for summary judgment.

### A.   Legal Standard

Under New Jersey law,[19] "if [an insurance] carrier wishes to control the defense [of a claim against the insured] and simultaneously reserve a right to dispute liability, it can do so only with the consent of the insured." Merchant Indem. Corp. v. Eggleston, 179 A.2d 505, 512 (N.J. 1962). The insurer can infer consent from "an insured's failure to reject an offer to defend" upon the terms set forth by the insurer. Id. However, "to spell out acquiescence by silence, the letter [in which the insurer offers coverage] must fairly inform the insured that the

---

[19] The parties agree that New Jersey law governs the majority of the claims at issue here, but that Pennsylvania law governs the fraudulent inducement claim.

offer may be accepted or rejected."[20]  Id.

This rule recognizes that the insurer's and insured's divergent interests may prejudice the insured's defense if the insurer is in control.  Griggs v. Bertram, 443 A.2d 163, 167 (N.J. 1982).  The law, therefore, will not assume than an insured has consented to the potential conflict unless the insured has expressly been informed of its right to do so.[21]  Id.

An insurer is deemed to have waived its right to deny coverage after the underlying claim has been adjudicated if all of the following conditions are present: (1) the insured did not consent to the conflict because a proper reservation of rights letter was not furnished by the insurer; (2) the insurer was

---

[20] The requirement that the letter fairly informs the insured of its right to reject the insurer's defense, has been construed liberally.  Pa. Nat'l Mut. Cas. Ins. Co. v. South State, Inc., 2008 U.S. Dist. LEXIS 98456, *8-9 (D.N.J. Dec. 3, 2008) (explaining that "no precise terms of art are necessary to reserve the right not to indemnify an insured," rather the letter issued by the insurer "must include some expressed indication that the insured has a choice to accept or reject the representation.").  Here, however, the letters do not in any way apprise Stonewell of its right to reject the offer of defense.

[21] "Analytically, a distinction should be drawn between (1) cases in which the loss is not within the policy coverage and (2) cases in which the policy does cover but fraud in the inception or a breach of the policy is claimed."  Eggleston, 37 A.2d at 512.  The former is an estoppel argument whereas the latter is a waiver argument.  Id.  Under these circumstances, the analysis is analytically the same for waiver and equitable estoppel, so the Court, in the interest of clarity, refers to both scenarios as a waiver issue.

aware of the facts on which it ultimately seeks to deny the coverage;[22] and (3) the <u>insurer</u> controls the litigation.   If all these conditions are met, an insurer cannot deny coverage even if a court finds that the insured engaged in fraud or is subject to the insurance policy's exclusion from coverage provision.   <u>Id.</u>

### B. Application

Here, the Court finds that neither of the two reservation of rights letters to Stonewell informed Stonewell that it had a right to accept or reject the defense offered by Conestoga. Therefore, Stonewell's silent acquiescence to the defense offered by Conestoga cannot be understood as consent to a potential conflict of interest between Conestoga and Stonewell.

The Court then considers whether the failure to obtain either express or implicit consent is material.   The Court concludes that the deficiency in the first letter of reservation is immaterial, but the deficiency in the second letter of reservation may be material.   For the following reasons, genuine issues of fact preclude the Court from deciding as a matter of

---

[22] When assessing whether an insurer "knew" the information on which the insurer seeks to later deny coverage, the jury considers whether the insurer exercised reasonable diligence upon becoming aware of information.   <u>Eggleston</u>, 179 A.2d at 514 ("If a carrier receives information suggesting fraud or breach of contract, it must seek the facts with reasonable diligence, and having acquired them it must within a reasonable period decide whether to continue to perform. What is a reasonable time depends upon the circumstances."); <u>Merchs. Ins. Co. of N.H., Inc. v. 3 R Painting & Contr. Co.</u>, 2007 U.S. Dist. LEXIS 69269 (D.N.J. Sept. 18, 2007)(applying <u>Eggleston</u>).

law the materiality of the deficiency in the second letter.

      1.  <u>First Letter of Reservation</u>

The deficiencies in the first letter are immaterial because Conestoga did not undertake the defense of the <u>Williams</u> action with knowledge of the bases on which it seeks to deny coverage – Stonewell's alleged fraud or Stonewell's status as a nominee and not an owner of the Center Point Mortgage.

A reasonable jury could not conclude that in 1997, Conestoga could have gained knowledge of the alleged fraud if it had acted with reasonable diligence.  The Florida Courts took years to unravel Weiss's fraudulent conduct and Gladstone's role in it. Therefore, Conestoga cannot be expected to have uncovered Gladstone's conduct before it agreed to defend Stonewell in <u>Williams</u> action.

Likewise, without the benefit of the <u>Weiss</u> criminal trial or the evidentiary hearings that formed a basis for Judge Fawcett's October 2002 Order, Conestoga, acting with reasonable diligence, could not have known that Stonewell was acting as Weiss's nominee and did not have any ownership interest in Center Point Mall.

Because Conestoga did not have knowledge of either of the bases for which it seeks to deny coverage before it agreed to defend Stonewell in the <u>Williams</u> action, the Court finds that the deficiency in the first letter is immaterial.

      2.  <u>Second Letter of Reservation</u>

Conestoga's second reservation of rights letter, dated July 28, 2004, does not in any way notify Stonewell that it has the right to reject Conestoga's offer to provide for a legal defense to the Amended Forfeiture Order.  Therefore, the Court cannot infer from Stonewell's silent acquiescence that Stonewell consented to the potential conflict of interest that could have arisen by virtue of Conestoga funding Stonewell's defense.

Conestoga's failure to obtain either implicit or explicit consent to the potential conflict of interest is material if Conestoga agreed to fund Stonewell's Second Amended Petition with knowledge of the basis on which it now seeks to deny coverage <u>and</u> then Conestoga exerted control over the defense.

The Court finds that there is a genuine issue of material fact as to: (1) when Conestoga had knowledge of the facts on which it would ultimately seek to deny coverage[23] and (2) the question of whether Conestoga controlled the litigation in the Second Amended Petition.  Therefore, the Court cannot grant summary judgment on the question of whether Conestoga waived its

---

[23] The Court finds that there is a genuine issue of material fact only as to when Conestoga knew of the alleged fraud.  The Court finds as a matter of law that Conestoga knew or could have known with reasonable diligence the facts that form its basis for denying coverage on the ground that Stonewell did not suffer a loss and thus was subject to the exclusion provision in the Mortgage Policy.  The October 2002 Order decisively resolved the issue of whether Stonewell suffered a loss. Therefore, Conestoga should have known the facts on which it now seeks to deny coverage on the ground that the loss is subject to the Mortgage Policy's exclusion provision.

right to deny coverage.

a.  Knowledge of Fraud

Here, there is genuine issue of material fact as to when Conestoga knew of Stonewell's alleged fraud.  Conestoga in its reservation of rights letter said, "We have reason to believe that the Insured may have misrepresented or omitted certain material facts in connection with the application of this Policy."  Conestoga declined, however, to deny the defense because it was "continuing to investigate this issue."  This letter suggests that the Conestoga did not know pertinent facts regarding Stonewell's alleged fraud when it agreed to provide Stonewell with a defense for the Amended Forfeiture Petition.

Stonewell, however, contends that Conestoga, with reasonable diligence, should have known since November 1999 the facts on which Conestoga now seeks to deny coverage.  On November 2, 1999, the jury in the Weiss Action entered a verdict of forfeiture against Weiss's interest in Stonewell.  The jury was explicitly told the following by Weiss's counsel: "In order for you to enter a verdict of forfeiture as to Stonewell Corporation, you have to totally disbelieve Richard Gladstone and the documents that corroborated his testimony."   The jury returned a verdict that forfeited Weiss's interest in Stonewell to the United States.

Gladstone was not, however, a defendant in the Weiss criminal trial.  Therefore, the jury's finding of guilt in the

<u>Weiss</u> trial did not extend to Gladstone.

Moreover, Stonewell has not established that the facts on which the October 2002 Order relied are the same facts on which Conestoga relies upon in its effort to establish Stonewell engaged in fraud.  Therefore, a genuine issue of material fact exists as to whether Conestoga knew or could have known with reasonable diligence the facts on which it seeks to deny Stonewell coverage on the ground that Stonewell committed fraud.[24]

b.  <u>Control of the Litigation</u>

The Court also finds that there is a genuine issue of material fact as to whether Conestoga controlled the litigation of the proceedings related to the Second Amended Petition.[25]

---

[24] For these reasons, the Court also declines to find as a matter of law that Conestoga's claims were not filed within the applicable statue of limitations.

[25] Neither of the parties cites cases that discuss what "control of a defense" entails, although their briefing suggests that they agree that control of the defense involves selecting counsel, making material decisions, and being informed of all pertinent information regarding the litigation.  The New Jersey courts that have considered whether an insurer "controlled" a defense, have looked to who appointed the counsel and whether the insurer was making pertinent decisions.  <u>Ebert v. Balter</u>, 200 A.2d 532, 541 (Union County Ct. 1964)(explaining that the right to be represented by one's own counsel is "a valuable right" and therefore, an insured who allows the insurer to appoint counsel is relinquishing control); <u>Griggs v. Bertram</u>, 443 A.2d at 167 ("[O]nce the insurer has acknowledged the claim and assumes control of the defense, the insured is justified in relying upon the carrier to protect it under its policy and to be responsible for any judgment against it.").

Stonewell argues that the following facts support its claim that Conestoga controlled its defense in the Amended Forfeiture Petition: (1) Stonewell was using Dollinger, who was originally appointed by Conestoga, as counsel in the proceedings; (2) Dollinger represented one of Conestoga's employees in 1999 and had worked on several matter involving Lawyers Title Insurance Corporation, a reinsurance company with which Conestoga had a reinsurance agreement; (3) Dollinger made decisions that represented Conestoga's interests but not Stonewell's interests, such as filing the Amended Forfeiture Petition;(4) Dollinger excluded Gladstone from meetings with Lawyers Title Insurance Corporation; and (5) the reservation of rights letter, as well as the Mortgage Policy, stated that Conestoga must be involved in all substantive decisions or negotiations in connection with the defense.

Conestoga argues that these factual assertions do not establish that Conestoga controlled the defense of the Amended Forfeiture Petition for the following reasons: (1) Conestoga may have appointed Dollinger for the Williams action, but thereafter, Stonewell chose to use him and even retained him when Conestoga refused to pay to defend certain actions; (2) Gladstone stated on the record in the Williams Action that Dollinger was his attorney and represented his interests; (3) Stonewell offers no concrete evidence of Conestoga involving itself in the decision-making

regarding the Amended Forfeiture Petition; and (4) not until the Florida litigation was over, did Stonewell even suggest that its interests were not being represented by Dollinger.

The Court finds that resolving the question of whether Conestoga controlled the litigation requires, at a minimum, a credibility determination as to whether Conestoga or Lawyers Title Insurance Corporation excluded Stonewell from these meetings.  Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.), 574 F.3d 129, 152 (2d Cir. 2009).  The Court, therefore, cannot make a finding as a matter of law that Conestoga controlled the defense of the Amended Forfeiture Petition.

### C.  Conclusion

The Court cannot decide whether Conestoga has waived its right to deny coverage under the Mortgage Policy without resolving the questions of whether Conestoga (1) knew about Stonewell's alleged fraud when it agreed to fund the defense of the Amended Forfeiture Petition and (2) controlled the defense of the Amended Forfeiture Petition.  Accordingly, the Court DENIES both parties motions for summary judgment on the waiver claim.[26]

---

[26] Conestoga argues that this deficiency in Conestoga's reservation of rights letter is immaterial because the Mortgage Policy said that Conestoga has a "right to select counsel of its choice (subject to the right of the insured to object for reasonable cause)."  New Jersey law clearly establishes that in order for the Court to infer consent from the insured's silence, the reservation of rights letter must inform the insured of a right to deny the coverage.  Conestoga does not cite, nor has the Court found, decisions in which the New Jersey courts have ruled

## VI. Conclusion

For the reasons discussed herein, Stonewell is collaterally estopped from arguing that it ever owned the Center Point Mortgage or that it was unaware that it was acting as Weiss's nominee.

The Court finds that Title Defendants' motion for summary judgment (D.E. 37) is GRANTED in its entirety and Stonewell's cross-motion for summary judgment on its claims against Title Defendants (D.E. 46) is DENIED.

The Court also concludes that a genuine issue of material fact exists as to whether Conestoga has waived its right to deny coverage under the Mortgage Policy.  Therefore, the Court DENIES both Conestoga's motion (D.E. 39) and Stonewell's motion (D.E. 46) for summary judgment.

Conestoga and Stonewell are required to submit to the Court

_____

that the reservation of rights letter did not need to inform the insured that it had the right to reject the offer of a defense because that option was enumerated in the governing policy.  The Court's fidelity to the clear principle articulated by the New Jersey courts requires the Court to reject this argument advanced by Conestoga, especially because Conestoga does not substantiate its claim that Stonewell knew it could reject the offer of defense.

The Court also rejects Conestoga's argument that Stonewell suffered no prejudice as a result of Conestoga's offer of a defense.  Because there is a genuine issue of material fact as to whether Conestoga controlled the litigation, the Court finds that there is a conclusive presumption of prejudice that Conestoga has failed to rebut. <u>Griggs</u>, 443 A.2d at 168-73.

a Joint Pretrial Order by <u>October 14, 2009</u>. The Joint Pretrial

Order shall comply with Rule 3(A) cf the Court's individual

practices. The case will be deemed ready for trial as of <u>October</u>

<u>19, 2009</u>.

So Ordered.

Dated:   New York, NY
         September24, 2009

                                    KIMBA M. WOOD
                                    United States District Judge

35